```
 1                     IN THE UNITED STATES DISTRICT COURT

 2                     IN AND FOR THE DISTRICT OF DELAWARE

 3                                - - -
      IN RE:
 4                                        : Chapter 11
      NORTEL NETWORKS INC., et al.,       :
 5                                        : Case No . 09-10138-KG
                       Debtors.           :
 6    _____    Jointly Administered

 7    JOINT ADMINISTRATORS,               :    CIVIL ACTION
                                          :
 8                     Appellant,         :
      v                                   :
 9                                        :
      NORTEL NETWORKS INC., et al.,       :
10                                        :    NO. 13-757-LPS
                       Appellee.          :
11                                - - -

12                          Wilmington, Delaware
                            Tuesday, July 19, 2013
13                          Telephone Conference

14                                - - -

15    BEFORE:          HONORABLE LEONARD P. STARK, U.S.D.C.J.

16                                - - -
      APPEARANCES:
17


18
                    YOUNG CONAWAY STARGATT & TAYLOR, LLP
19                  BY:  EDWIN J. HARRON, ESQ.,
                         JOHN T. DORSEY, ESQ., and
20                       JAIME LUTON CHAPMAN, ESQ.

21                       and

22                  HUGHES HUBBARD & REED, LLP
                    BY:  DEREK J.T. ADLER, ESQ.
23                       (New York, New York)

24                       and

25                                        Brian P. Gaffigan
                                          Registered Merit Reporter
```

```
 1    APPEARANCES:  (Continued)

 2
                   HERBERT SMITH FREEHILLS, LLP
 3                 BY:   JOHN WHITEOAK, ESQ.
                         (London, England)
 4
                              Counsel for Appellant
 5

 6                 MORRIS NICHOLS ARSHT & TUNNELL, LLP
                   BY:   DEREK C. ABBOTT, ESQ., and
 7                       ANN C. CORDO, ESQ.

 8                     and

 9                 CLEARY GOTTLIEB STEEN & HAMILTON, LLP
                   BY:   JAMES L. BROMLEY, ESQ.
10                       (New York, New York)

11                            Counsel for Appellees

12
                   RICHARDS LAYTON & FINGER, P.A.
13                 BY:   CHRISTOPHER M. SAMIS, ESQ.

14                     and

15                 AKIN GUMP STRAUSS HAUER & FELD, LLP
                   BY:   FRED S. HODARA, ESQ.,
16                       ABID QURESHI, ESQ., and
                         DAVID H. BOTTER, ESQ.
17                       (New York, New York)

18                            Counsel for the Committee
                              of Unsecured Creditors
19

20

21

22                            - oOo -

23                     P R O C E E D I N G S

24                 (REPORTER'S NOTE:  The following telephone

25    conference was held in chambers, beginning at 3:32 p.m.)
```

1          THE COURT:  Good afternoon, everybody.  This is

2    Judge Stark.  Who is there, please?

3          MR. DORSEY:  Good afternoon, Your Honor.  It's

4    John Dorsey at Young Conaway Stargatt & Taylor on behalf of

5    the appellants.  I have Ed Harron and Jaime Chapman with me

6    in my office; and there are also some other folks on behalf

7    of the appellants, including our lead counsel, Derek Adler

8    with Hughes Hubbard, and I believe he has folks with him in

9    his office.  We also have John Whiteoak of Herbert Smith

10   Freehills joining us from London and Dan Lindell of Ernst &

11   Young is one of the Joint Administrators.

12         THE COURT:  Okay.  Thank you.  And who will be

13   speaking on behalf of the appellants?

14         MR. DORSEY:  Mr. Adler, Your Honor.

15         THE COURT:  Okay.  Thank you.

16         MR. ABBOTT:  And, Your Honor, this is Derek

17   Abbott from Morris Nichols.  On the phone with me is Ann

18   Cordo from my office as well as Jim Bromley and a number of

19   his colleagues from the Cleary Gottlieb firm.  Mr. Bromley

20   will be handling the argument for the debtors, Your Honor.

21         THE COURT:  All right.

22         MR. HODARA:  Your Honor, along with the debtors,

23   for the Official Committee of Unsecured Creditor, Akin Gump;

24   and from Akin Gump, myself, Fred Hodara; Abid Qureshi, and

25   David Botter.

1          MR. SAMISS:  Your Honor, also for the Official

2    Committee of Unsecured Creditors, this is Chris Samiss from

3    Richards, Layton & Finger.

4          THE COURT:  Okay.  Thank you.  Anybody else?

5          MR. BERKOW:  Your Honor, this is Joseph Berkow of

6    Allen & Overy on behalf of the minder, the Canada Debtors in

7    the Canada proceedings.  We are not a party to the appeal.  We

8    have simply dialled in as an observer only.

9          THE COURT:  That's fine.  Thank you.

10          I have my court reporter here with me.  For the

11    record, it is our case of Joint Administrators versus Nortel

12    Networks Inc. et al, Civil Action No. 13-757-LPS.  We have

13    pending before us the Joint Administrators' motion for leave

14    to pursue the appeal, and I set this call in order to hear

15    more about that pending motion.  So let me hear first from

16    the moving party, the Joint Administrators, please.

17          MR. ADLER:  Good afternoon, Your Honor.  This is

18    Derek Adler from Hughes Hubbard.  Thank you for giving us an

19    opportunity to address this with you.

20          Could I inquire, would it be useful to go

21    through the full background of this or has Your Honor had an

22    opportunity to review at least that aspect of the papers?

23          THE COURT:  I think it was well set out by you

24    all.  I have reviewed the papers so we can dispense for now

25    with the background.  If I need further background, I'll let

1    you know.

2                MR. ADLER:  All right.  Then as your Honor knows,

3    the appeals that we're dealing with here come from a decision

4    by Judge Gross entered back in April which had two aspects:

5                There was a denial of our motion to compel

6    arbitration of the dispute between the different international

7    Nortel estates over how to allocate the $7.5 billion of

8    proceeds that is awaiting distribution in escrow in New York.

9                Then there was the other part of his decision

10   which ordered that the allocation dispute would be tried in a

11   unique and unprecedented cross-border trial, a simultaneous

12   trial by video between the Delaware Bankruptcy Court and the

13   Ontario Insolvency Judge, Commercial Judge, and that would

14   also be done in conjunction with a trial of the claims that

15   are asserted between the two estates as well.

16               So the status of the appeal of the motion to

17   compel arbitration, we do have a right to appeal that as

18   of right.  The Third Circuit has accepted that for direct

19   appeal, and we just got a decision two days ago that has

20   granted a joint motion of the parties to handle that on an

21   expedited basis.  So the arbitration piece will be briefed

22   between now and September 5th, and presumably the Court will

23   schedule oral argument soon thereafter.

24               The basis for the current appeal is we're

25   seeking leave from the part of the order that directed that

1    the trial of the allocation dispute be done in a joint

2    cross-border trial.  We say that the parties didn't agree

3    to this.  We say that the U.S. Court, the Bankruptcy Court

4    doesn't have authority to go and create hybrid rules of

5    procedure, rules of evidence and so on to apply in such a

6    joint trial.  We say certainly -- and I think this is not

7    disputed -- that the U.S. judge doesn't have the right

8    to form a panel and deliberate together with a judge in

9    Ontario.  I think that is conceded.  But the procedures that

10   have been put into effect create a very strong risk of that.

11           But, most importantly, the procedure that has

12   been put into place doesn't meet the most basic requirement

13   of due process because it doesn't lead to a single binding

14   judgment that will resolve the dispute over how to allocate

15   the $7.5 billion.

16           THE COURT:  Let me interrupt you there, Mr. Adler.

17   Let me interrupt you there.

18           So did you try to get certification of an appeal

19   from the interim allocation order in the Third Circuit?

20           MR. ADLER:  Yes.  We had asked the Third Circuit

21   to take that aspect of it at the same time.  There was a

22   motion to certify.  That was made originally by the U.S.

23   Debtor.  We joined that but said can we also make it clear

24   that you would take that aspect of it as well?  And the

25   Third Circuit denied that.  So that aspect of this is still

1    in front of Your Honor.

2            THE COURT:  Right.  So my question is, your

3    motion for leave, doesn't it present to me the very same

4    issue that was presented to the Third Circuit and denied by

5    them?

6            MR. ADLER:  It wasn't briefed in the same

7    manner.  I think that the question of how they came out

8    on that isn't preclusive of Your Honor on that point.  It

9    was just they essentially didn't disturb Your Honor's

10   jurisdiction over that aspect of the motion for leave to

11   appeal.

12           THE COURT:  Okay.  Let's assume that I have the

13   discretion to decide differently than they did.  Why should

14   I decide differently?  Fundamentally, why should I involve

15   myself in this court right now in an interlocutory appeal

16   from a preliminary interim order?

17           MR. ADLER:  Because as we laid out in our

18   papers, this does present a very clear case for leave under

19   the criteria that the courts typically apply in this case.

20   The issues are extremely important to the creditors of

21   Nortel here and around the world.  They've been waiting a

22   long time for this money to be distributed to the various

23   creditors, and the procedures that we're going down here

24   plainly will not lead to a resolution of that.  It results

25   in a deadlock between two judgments with no way to resolve

1    it.  So it is quite important.

2              It is a case of first impression.  There is no

3    instance where a joint cross-border trial has been conducted.

4    The procedures that have been done between Bankruptcy courts

5    have typically been to handle various administrative matters,

6    approving sales, approving various other coordination

7    functions, but there has never been a joint trial of what is

8    in effect an adversary proceeding, particularly in a context

9    where you have got the U.S. Court against the Canadian Court

10   in a situation where the Canadian Debtor is claiming the

11   majority of the $7.5 billion, the U.S. Debtor is claiming the

12   majority of the $7.5 billion and the two judges effectively

13   have to decide which of their respective Debtors is going to

14   get the lion's share of that money.

15             So it's a very unique situation with a

16   controlling question of law whether this can happen and

17   certainly a substantial ground for difference of opinion.

18   An immediate appeal will materially advance the ultimate

19   determination.  It will get us on a track where we're not

20   going to be headed towards this dual judgment deadlock that

21   we're headed towards at the moment.

22             THE COURT:  Well, you have said a lot of things

23   about the dual judgment deadlock.  I think a moment ago you

24   said, absolutely, that is where we're going to end up,

25   basically not allowing for any possibility that we could

1    avoid that under the interim allocation order.  Now you are

2    saying maybe it's a possibility.  I thought from the papers

3    you were saying maybe it's a possibility.

4              Help me figure out your position.  Are you

5    saying if I don't get involved and I let things play out

6    according to the order that is in place, there is just no

7    way, there is no chance whatsoever we're going to end up

8    with judgments that are enforceable and consistent with

9    one another?

10             MR. ADLER:  I can't say that we can't exclude

11   the possibility, but it's really extremely unlikely.  The

12   nature of the dispute here requires the two Courts to look

13   at nine separate sales of assets, of global businesses of

14   Nortel or actually eight sales of businesses and one sale

15   which was the sale of the residual IP, just residual

16   intellectual property and not a functioning business.  The

17   Court will have to look at each of those sales and look at

18   the entitlement of up to 40 separate entities around the

19   world, each of them, to the proceeds of each of these

20   nine separate transactions.  There is actually over 100

21   individual decisions with dollar amounts attached to them

22   that the Courts will have to decide as far as who gets how

23   much from each of these sales.

24             First of all, we all have to hope and pray that

25   they come out the same way on each of these hundreds of

1    different decisions or they have to get to that, applying

2    their own choice of law rules and so on.  And then after

3    that, there are the two separate appeal processes which go

4    on through the two different court systems.  This has been

5    a hotly contested case.  I think we have to unfortunately

6    anticipate there may be appeals, and that will continue to

7    take the two judgments off in separate directions.  So it

8    seems to me that it's extremely unlikely is what I would say

9    that they will come out the same.

10           But, in addition, we're engaged in a purported

11   judicial process that isn't designed to lead to a single

12   binding judgment.  I only say that is a fundamental defect

13   in due process.

14           THE COURT:  What about the subsequent order

15   entered by Judge Gross I believe in May?  You're attempted

16   appeal is from an order in April.  Doesn't the May 1st order

17   make any issue relating to the April order moot?

18           MR. ADLER:  It doesn't.  The salient features

19   that we challenge on this appeal are all present in the

20   April order.  The April order granted the motion by the U.S.

21   Debtor to hold a joint trial, to have this procedure that I

22   have just described.  Subsequent orders don't supersede

23   that order, and they don't modify any of the features I have

24   just described of having the two judgments, of being in a

25   situation where there will need to be a joint trial under

1    who knows what rules of evidence and procedure.  They're

2    essentially scheduling orders and other administrative

3    matters with the conduct of the case between now and next

4    January when the trial is scheduled to begin.

5              THE COURT:  What is the status of the proceedings

6    in front of Judge Gross?  Are they stayed pending the appeal

7    or are they ongoing and heading toward the trial that he

8    scheduled?

9              MR. ADLER:  They're ongoing and heading towards

10   the trial that he has scheduled.  We moved for a stay of those

11   proceedings.  In the Third Circuit, there is controlling case

12   law that says that where you appeal from a denial of a

13   motion to compel arbitration that the proceedings below are

14   automatically stayed until the appeal is decided unless the

15   judge finds that the appeal is frivolous.

16              There is a decision that was entered.  The U.S.

17   Debtor resisted our motion for stay.  They argued our appeal

18   was frivolous.  And Judge Gross found that.  Essentially he

19   said he wanted the proceedings to go forward.  He wanted

20   discovery and so on to go forward and found that the case is

21   frivolous, that the appeal of his own order is frivolous.

22              Now, that is something that we had -- we

23   obviously don't agree with that.  We actually don't object

24   to proceeding with the pleadings on allocation and discovery

25   on allocation because all of the work we're doing on that

1    will be usable whether the eventual decider of this is a

2    court or a panel of arbitrators.  So we don't, for reasons

3    of efficiency, we don't object to getting through these, you

4    know, doing discovery and so on.  So that is done.

5            We have offered to stipulate that with the U.S.

6    debtor and the other parties but instead there is an order

7    now in which Judge Gross has denied a stay.

8            Now, we had anticipated.  As you know, we moved

9    for expedited treatment in the Third Circuit.  We had hoped

10   that would get acted on sooner.  Looking at the schedule on

11   the basis of the decision that was entered in the briefing

12   schedule that was entered two days ago, there is really now

13   a pretty strong risk that there won't be a decision from

14   the Third Circuit on the arbitration question before the

15   January 6th trial date.  So for that reason, we will be

16   making a motion for a stay before Your Honor that is

17   separate from the motion for leave that is before you now.

18           THE COURT:  All right.  Obviously, I don't have

19   that motion in front of me so I'm not saying anything about

20   that, and I'm not taking any position today on whether the

21   appeal you have pending as of right in the Third Circuit is

22   frivolous or not.  So I don't mean for you to read anything

23   into my question.

24           But my question is you could prevail in the

25   Third Circuit on your appeal, which, if you do, as I

1  understand it, would mean that you would be in front of an

2  arbitrator and any issue that might be pending in front of

3  me relating to your requested appeal we're talking about

4  now and the allocation order, that would all be mooted by a

5  decision that this matter really should be with arbitrators.

6  Am I right about that?

7            MR. ADLER:  You are right about that, Your

8  Honor.  Under the circumstances, though, we don't think we

9  can wait for the Third Circuit decision to come down before

10  addressing this.  Obviously, we had hoped to have the two

11  aspects of the appeal before the same reviewing court at the

12  same time.  It hasn't played out that way, but because of

13  the seriousness of the issues and the importance of the

14  issues, we do believe the appropriate approach is still for

15  you to address our motion on the protocol aspect separately.

16            THE COURT:  Thank you.  That is helpful.  I will

17  give you a chance for rebuttal, but I want to at this time

18  turn it over to the other Debtors to go ahead and say what

19  they would like.

20            MR. BROMLEY:  Thank you, Your Honor.  This is

21  James Bromley of Cleary Gottlieb.  We're counsel to Nortel

22  Networks Incorporated and the other U.S. Debtors in the

23  cases before Judge Gross and now in these appeals before

24  Your Honor.

25            The question we think is a relatively narrow

1    here.   Interlocutory appeals are exceptional.  They're to

2    be used sparingly and only in very unique situations.  We

3    don't think any of those circumstances exist in this case

4    to justify an interlocutory appeal of what is a procedural

5    decision.   Indeed, I will get to the point of mootness with

6    respect to the actual order that is the subject of this

7    motion.

8              When we're stepping back and looking at the

9    situation here, for most of the time that we have been dealing

10   with this motion for leave, we have also been talking at the

11   same time about the EMEA Joint Administrators' appeal to the

12   Third Circuit.

13             The appeal to the Third Circuit is not the only

14   appeal that goings on however, Your Honor.  There has been

15   a simultaneous appeal by the EMEA Joint Administrators in

16   Canada of similar orders which somewhat belies the concerns

17   of the Joint Administrators have raised about the inability

18   of the courts to cooperate and the problems that simultaneous

19   appeals might present.

20             There was a motion for leave to appeal made to

21   the Canadian Ontario Court of Appeal, and there is no appeal

22   as of right as to the cross-motion with respect to

23   arbitration.  The Canadian Ontario Court of Appeal has

24   denied that motion for leave, as we updated the Court in a

25   letter about a month ago.  And there has been no further

1    activity in Canada by the Joint Administrators.

2              So what we have on the issue of arbitration is a

3    fairly strong set of decisions.  We have decisions from Judge

4    Gross and Justice Morawitz at the trial level, both strongly

5    stating that there was no agreement to arbitrate, and that the

6    jurisdiction with respect to the Joint Administrators of both

7    Courts for a trial was voluntary.  Voluntary submission to

8    jurisdiction by the Joint Administrators over a very long

9    period of time.  We're nearly at the fifth anniversary of the

10   commencement of these proceedings.  And,

11             The Administrators have happily participated in

12   literally in dozens of cross-border hearings, and they're

13   not simply administrative hearings as Mr. Adler said.  They

14   are, and have been, hearings that have been hotly contested,

15   including the hearing that led to the orders that are the

16   subject of this motion for leave as well as the appeal to

17   the Third Circuit.

18             So not only did Justice Morawitz and Judge Gross

19   find in separate reasons, separately reasoned orders and

20   separately entered orders that were issued after a joint

21   hearing, that there was no agreement to arbitrate, Judge

22   Gross separately found that the appeal to the Third Circuit

23   was frivolous, and in so doing, retained jurisdiction over

24   all discovery matters.

25             That decision was issued on May 7th, 73 days

1   ago, and not once during that period of time have the Joint

2   Administrators moved for a stay.

3           We're happy that the Third Circuit has granted

4   our motion, our joint motion for expedition but we believe

5   the Third Circuit will have ample time to reach a decision

6   on whether or not there was an agreement to arbitrate and

7   to do so before the scheduled hearing of January 2014.

8           Indeed, the Courts entered the schedule that

9   the parties collectively and cooperatively submitted to the

10  Third Circuit, and so we will be fully briefed by early

11  September.  And we believe with respect to the issue that is

12  before the Third Circuit on arbitration that it will be very

13  easy for the Courts to find that Judge Gross was correct the

14  first time as well as with respect to his order finding that

15  the appeal was frivolous.

16          When we're talking about the standards for an

17  interlocutory appeal, the question really boils down to is

18  whether or not the standards for granting that exceptional

19  relief are met in this case.  And I think, respectfully, the

20  answer to that is no, and a resounding no.

21          The first issue is whether or not there is a

22  controlling question of law.  And the question of law that

23  Mr. Adler has described today I would summarize as saying

24  there is no chance there will be a single binding order

25  entered.

1              Well, we are before two Courts.  There will

2    be two orders entered.  That is the way that every one of

3    these sales was conducted.  There were separate orders

4    entered after evidentiary hearings that were held by video

5    conference before both Courts with the full and active

6    participation of the Joint Administrators.

7              In every one of those circumstances, some of

8    the most sophisticated participants in the world economy

9    committed $7 and-a-half billion to purchase assets from the

10   Nortel Debtors in reliance on orders issued by the U.S. and

11   Canadian Courts separately after joint hearings.

12             So the idea that this has never happened or it is

13   unprecedented simply belied by the record in this case and by

14   the docket of the Delaware Bankruptcy Court that shows that

15   over and over and over with respect to non-administrative

16   matters but rather highly substantive matters, joint hearings

17   were held, separate orders were issued and substantial

18   commitments were made and substantial payments were made.

19             The single binding order language that Mr. Adler

20   uses is really a plea for a granting of the motion to compel

21   arbitration.  Mr. Adler and his clients want there to be an

22   arbitration.  In that context, there would be a single

23   order.  But we have had both Courts, in the U.S. and Canada,

24   as well as the Canadian Ontario Court of Appeal say in very

25   definitive language that there was no agreement to arbitrate.

1               Even if the U.S. Court were to find at the Third

2       Circuit that there was an agreement to arbitrate, the fact

3       that the Canadian Court of Appeal has found that there was

4       not would destroy the ability to have this arbitration that

5       Mr. Adler believes should take place.

6               It is very I think frustrating for the Creditors

7       as well as the Debtors in these cases to be continuing to

8       fight over this forum issue.  Mr. Adler says the folks have

9       been waiting for a very long time for distributions, and

10      that is true.  But there has been as clear statements as

11      possible from the Courts who have reviewed this already that

12      there is no agreement to arbitrate.  And that is the only

13      way that there would be a single binding order.

14              Now, failing that, what we would have is exactly

15      what we have had in this particular matter, which is a contest-

16      ed hearing that was held by video conference simultaneously in

17      Toronto and in Wilmington that led to the issuance of separate

18      orders.  Justice Morawitz's order denying the motion for

19      arbitration and Judge Gross's denying the cross-motion for

20      arbitration were separate orders.  And the orders approving

21      the allocation protocol issued by the Canadian Court and the

22      U.S. Court were separate orders, and those separate orders

23      were appealed separately in each of the two jurisdictions.

24              There has been no catastrophe.  There has been

25      no halt to any of the process.  All of the parade of

1    horribles that Mr. Adler sets out have failed to manifest

2    themselves in the very manner that we are discussing today.

3         So when we talk about a controlling issue of law

4    that should take us out of the typical rule, which is that

5    interlocutory appeals should not be addressed, the question

6    is what is the question of law?  And as far as we can tell,

7    Mr. Adler's argument is that due process would not be served

8    by having such joint hearings and having separate orders.

9    But, again, that isn't a question of law, that is a question

10   of process.

11        When we look at the next question, whether or

12   not there is a substantial ground for a difference of

13   opinion as to the controlling question of law, the Joint

14   Administrators focus first that this is an issue of first

15   impression.  And we vehemently disagree with that.  Not

16   only are cross-border protocols endorsed widely in the

17   insolvency field, the cross-border protocols between U.S.

18   and Canadian courts are the model for court-to-court

19   cooperation around the world.  And,

20        In this particular case, these Joint

21   Administrators have been full and active participants in

22   multiple cross-border hearings.  It is only because, in

23   this particular circumstance, that they want arbitration

24   that they have raised for the first time, after nearly five

25   years, the concern that none of this can work.  But the fact

1  that we're having an argument about $7 and-a-half billion is

2  proof that it does work.

3          The next factor to take into account is whether an

4  immediate appeal from the interlocutory order would materially

5  advance the ultimate determination of this litigation.  And

6  the answer to that is simply no.  It would complicate it, not

7  advance it.

8          The Third Circuit has addressed the question

9  whether or not this cross motion should be addressed now, and

10  their answer was not.  We believe that that is dispositive.

11          The Third Circuit has also said we would accept

12  the direct appeal.  We will schedule the argument and briefing

13  on the direct appeal on an expedited basis.  We believe

14  strongly that the Third Circuit will act quickly on this.  And

15  the basis for that belief is not simply the orders that have

16  been entered in this particular dispute, but this is not the

17  first time that the Nortel Debtors have been before the Third

18  Circuit.

19          The Third Circuit spoke in a decision two

20  and-a-half years ago with respect to a question of whether

21  or not certain U.K. Pension Creditors should be able to

22  litigate their claim against the U.S. Debtors in the United

23  States or before the Courts, an administrative tribunal in

24  the United Kingdom.  The Third Circuit said very clearly in

25  that circumstance, no.  They needed to do it in the United

1    States before Judge Gross in the Bankruptcy Court for the

2    District of Delaware.

3            There are two things we can take from that

4    exercise.  First, we argued that in September we had a

5    decision in December.  If that schedule kept in this

6    circumstance, we would have a decision before the trial

7    is scheduled to talk place.

8            There, that is without expedition.  A request

9    to the Third Circuit was made in that circumstance, and it

10   was denied.  Notwithstanding the denial of expedition, we

11   had a time frame that the Third Circuit followed, well known

12   for their efficiency.  I have full confidence they will do

13   the same here, particularly having granted the motions to

14   expedite, having taken the direct appeal and having denied

15   this very motion made to them directly by the Joint

16   Administrators.

17           In addition, Your Honor, the Third Circuit ended

18   their decision with respect to the U.K. Pension Administrators

19   with an admonition to the professionals in these cases that it

20   was critical that the parties proceed and proceed promptly to

21   an ultimate resolution and distribution of these funds.  We

22   believe that they recall that statement, and we believe that

23   they will make that statement again in spades with respect to

24   this appeal.

25           So from our prospective, Your Honor, the Debtors

1    strictly believe that this is an attempt to relitigate the

2    denial of the motion, to compel arbitration.  We believe that

3    the motion for leave today relates simply to a procedural

4    exercise.  This is no different than any other procedural

5    exercise that takes place in advance of trial.

6              If there are issues to be appealed after trial,

7    the Joint Administrators will have ample opportunity to do

8    so.  But what they want to do with this motion for leave is

9    to completely derail this exercise.  And,

10             With the appeal with respect to the denial of

11   the motion, the cross-motion to compel arbitration before

12   the Third Circuit, it is very likely that by September, this

13   will all be rendered moot when the Third Circuit makes its

14   decision.

15             Your Honor, that is all the Debtors have to say.

16   I think the Creditors Committee might have some points to

17   make as well, but I'm also happy to take any questions you

18   may have.

19             THE COURT:  No, thank you very much.  Did the

20   Committee wish to be heard from?

21             MR. BOTTER:  Your Honor, it's David Botter from

22   Akin Gump.  Just very briefly.  I would join with

23   Mr. Bromley's statements, and I would only respond to one

24   statement by Mr. Adler at the outset of his discussion.

25             One of his first points was that it was

1   important to the Creditors of Nortel that this issue be

2   decided, be decided promptly.

3           I wanted to note for the Court, as the Court I'm

4   sure is aware, that we have been joint movants with the

5   Debtors throughout this process in pursuing the direction

6   and the dual court determination.  We are the statutory

7   representative of all U.S. Creditors in these cases and,

8   frankly, we think that this is the best and most expeditious

9   process.  And, again, I join in all the statements of Mr.

10  Bromley.

11          Thank you, Your Honor.

12          THE COURT:  Okay.  Thank you very much.

13          Mr. Adler, you can respond, if you wish.

14          MR. ADLER:  Yes.  Thank you.  Just a couple of

15  points.

16          Mr. Bromley referred to the fact there have

17  been many previous joint hearings in this very case and, of

18  course, in various other bankruptcy cases.

19          That is certainly true, but the nature of what is

20  being presented here is completely different from anything

21  else that has ever been litigated in any cross-border hearing

22  we've heard of in any case.

23          You referred, for example, to the prior motions

24  that were made to approve the sales initially for the

25  bidding processes and subsequently for the actual sales

1    which were presented in joint hearings before the U.S. and

2    Canadian Courts, and the nature of that is each Court is

3    being asked to approve or disapprove of the sale in relation

4    to the approval of their particular Debtor.  There is no

5    overlap of the subject matter.  Each of them is making a

6    decision as to whether the -- in the case of the U.S. Court,

7    the U.S. Debtor should proceed with the sale.  In the case

8    of the Canadian Debtor, the Canadian Debtor should proceed

9    with the sale.  They're not seized of the same subject

10   matter.  And,

11           To the extent there is possibility of reaching

12   inconsistent decisions, if one of the Judges, for example,

13   held, found that the stalking horse bid was not sufficient,

14   something like that, that there would be a disapproval, the

15   thing could be renegotiated and re-presented, but it would

16   not leave us in a deadlock situation.  It would simply be

17   an inability to proceed with a particular transaction.  In

18   that sense, the Bankruptcy Judges are exercising their

19   supervisory power really over transactions of the individual

20   debtors under their control.

21           What is presented here in the allocation dispute

22   is something we have said should properly be done in an

23   adversary proceeding because it's really a lawsuit.  It's

24   not approval of a schedule or a claims process or a plan of

25   reorganization or any of the other things that Bankruptcy

1    Judges do in their administrative capacity.  The two Judges

2    are sitting as Trial Judges, litigating claims, hotly con-

3    tested claims in relation to the same risk, the same subject

4    matter where the dispute is actually between their two

5    respective Debtors over whom they exercise jurisdiction, so

6    it's a completely different nature.

7              In addition, it is a feature of our cross-border

8    protocol.  I think all cross-border protocols, that it gives

9    the judges the right and indeed the obligation to consider

10   whether particular disputes should properly be decided by

11   one judge rather than both judges in joint hearings.  This is

12   explicit in our cross-border protocol that the judges have

13   the jurisdiction to consider and to allocate responsibility

14   for particular matters to one of them or the other of them.

15   That is what we asked for here.

16             Mr. Bromley has suggested that the only way

17   to get to a single binding judgment here is through

18   arbitration.  But what we actually said to Judge Gross is,

19   at the conclusion of our argument, please don't take us

20   down this experiment, into this experiment to see if, by

21   happenstance, you and the two judges reach of the same

22   decision.  If you find this dispute is not subject to

23   mandatory arbitration, choose one of you to litigate it.

24   Decide whether one of you should litigate it.

25             Because at heart what is presented here is

1    actually a classic case of parallel proceedings pending in

2    two different jurisdictions where the two courts are seized

3    of the same subject matter, and there is a well developed

4    body of law that tells judges what to do in that situation.

5            There are times when one judge might decide to

6    enjoin the proceedings in the other jurisdiction.  There are

7    times when one judge might decide to stay his proceedings in

8    favor of the proceedings in the other jurisdiction.  And,

9            Then the alternative to that, there is so-called

10   race to judgment where the two courts simply proceed to

11   their separate judgments, but the advantage of that is that

12   the traditional rule is that the first judgment wins.  The

13   first judgment by one court seized of the same subject

14   matter is given preclusive effect and makes the matter res

15   judicata in the second court, assuming there is no gross

16   procedural defect.  And,

17           What has happened here is the judges have

18   intensionally created a situation where that rule, the first

19   judgment rule, is defeated because the two judgments it

20   appears will come out simultaneously.  So what we're looking

21   at is a situation where there will be no way, and we really

22   will be in a materially worse situation once the two

23   judgments have been entered.

24           The comity issues and the other issues that

25   will be raised on appeal will be much more difficult, if it

1    is a question of whether to favor the U.S. judgment over a

2    conflicting Canadian judgment and so on.  So I think that

3    covers it.

4              Far from wanting to derail the process, we have

5    been saying it can be done in an expeditious manner.  We do

6    the discovery now and instead of having a trial in January,

7    having an arbitration in January.  Arbitration can be done

8    as quickly as a trial.  The procedures would be similar but

9    you would have a panel of three arbitrators that would

10   decide the thing.  There isn't a chance of a deadlock where

11   you have one of them issuing one award.

12             In addition, alternatively, if this goes through

13   the process by which one of the judges decides it, that would

14   also be an approach that leads to one binding judgment.  We

15   are the ones that are going to provide the way out of the

16   deadlock, something that is going to tie up the Creditors for

17   years if it isn't addressed now.

18             I think, unless Your Honor has any further

19   questions, that is all I have to say.

20             THE COURT:  No, thank you.  Your arguments have

21   answered my questions, and I find that I am in a position to

22   make a decision on the motion.

23             I had carefully reviewed all of what you had

24   submitted prior to the call today, and the arguments today

25   have been helpful.  And as I say, the questions I have had

1    have been answered.

2              So with that, my decision on the Joint

3    Administrators' motion for leave to file an interlocutory

4    appeal relating to the allocation protocol order, my ruling

5    is that the motion for leave is denied.  I want to explain

6    why.

7              First, I've considered, of course, the three

8    factors that go into a decision as to whether or not an

9    interlocutory appeal is warranted.  In my view, those three

10   factors are not satisfied here, and that is basically for

11   reasons that have been articulated by the Debtors in the

12   papers and then to some degree reiterated on the call today.

13   I'm not going to linger too much on those specific three

14   factors because my decision turns really even more so than

15   just the failure to satisfy the three factors.

16             On the next step of the analysis, which is even

17   if I did think the three factors were satisfied, I then

18   have what amounts to I believe essentially a discretionary

19   decision as to whether or not the circumstances justifies

20   what is truly a departure from the very strong procedural

21   norm that appeals only take place after the completion of

22   proceedings; that is, take place from a final judgment and

23   not from an interlocutory appeal.

24             Here, even if the three factors were satisfied,

25   and they're not, I would still find not a proper basis or

1    not a basis in which I would permit the interlocutory appeal

2    to proceed.  So let me touch on some of those circumstances.

3                First, it does seem to me that the Third Circuit

4    has already made a decision on essentially the same issue.

5    The request to the Third Circuit to take up an appeal from

6    the allocation order at the same time that it was taking

7    up the appeal on the arbitration issue, that request of the

8    Third Circuit seems to me is materially the same request

9    that is now in front of me.  The Third Circuit denied that

10   request; and I don't see a reason for me to come out

11   differently than that.

12               Additionally, I think that there is a pretty

13   good argument that the appeal that the Joint Administrators

14   wish to press in front of me at this time is moot because

15   it's an appeal from an interim order issued by Judge Gross I

16   believe in April, and he has subsequently issued an order I

17   believe in May, and there is no appeal or even request for

18   an appeal from that subsequent May issue.

19               As important as all of that is that even

20   assuming the appeal is not moot, it seems to me that that

21   allocation order in April is a preliminary procedural order.

22   It is an order that contemplates quite a great deal of

23   additional process culminating in a trial, and I don't think

24   the circumstances warrant an appeal when there is that much

25   process still to occur in the Bankruptcy Court.

1          Further, I'm very mindful that all of this is

2   occurring in the context of a very large, very complex,

3   multinational proceeding.  It seems to me that to this point,

4   the Bankruptcy Court in the U.S. and the counterpart Court in

5   Canada have been ably handling this complex situation and the

6   Third Circuit very importantly is, of course, on an expedited

7   basis looking at a central piece of the parties' dispute;

8   namely, the arbitration issue.  If the Joint Administrators

9   are right that the parties have actually agreed to arbitrate,

10  then anything that I might do otherwise in connection with an

11  appeal on the allocation protocol would instantly become moot

12  and the efforts that the parties and the Court would put into

13  reviewing the procedures would be wasted because all of this

14  would end up ultimately with an arbitrator and there would be

15  no need for me to tell the Bankruptcy Court how it should

16  proceed or not proceed.

17          I'm also mindful that the Creditors have weighed

18  in and that they believe the appropriate way of proceeding

19  is the manner which has been set upon by the Bankruptcy

20  Court in the allocation protocol.  And,

21          A final factor that weighs in my discretion and

22  would cause me to not take this interlocutory appeal again

23  even if the three criteria were satisfied is I think my

24  decision today is consistent with at least the spirit of

25  Judge Sloviter's comments at the end of the opinion in

1    relation to an earlier appeal arising from this bankruptcy,

2    the appeal that was alluded to on the call today.

3              Fundamentally, therefore, I just don't think

4    that it will materially advance the termination of this

5    litigation, and I don't think that it would be under the

6    circumstances the best exercise of my discretion for me and

7    this court to get involved in the middle of the allocation

8    proceeding, which is what the Joint Administrators are

9    asking the court to do.

10             In saying all that, and ruling that way, I

11   recognize that there are risks in my decision.  In deferring

12   an appeal until after a final judgment, assuming, of course,

13   that the case stays in the Bankruptcy Court and doesn't go

14   to arbitration -- in deferring the appeal to final judgment,

15   it could be there is some risk that ultimately I or another

16   appellate body will decide that the Joint Administrators

17   were right all along.  This was inconsistent with due

18   process or in some other way was fundamentally flawed and,

19   therefore, it has to be done over again.  I recognize that

20   is a risk.  That is a risk inherent in the final judgment

21   rule.

22             Alternatively, however, it may be that the

23   appeal from a final record, from a concrete record may turn

24   out to be much easier to resolve than one in the unsettled

25   preliminary interlocutory circumstances that we face today.

1          So, in any event, for all of those reasons,

2     my decision is to deny the motion for leave to file an

3     interlocutory appeal.  I will get a written order out to

4     that effect but the analysis is what I have just attempted

5     to articulate to you today.

6          Are there any questions about what I have ruled,

7     Mr. Adler?

8          MR. ADLER:  No.  Thank you, Your Honor.  I think

9     we understand your ruling.

10         THE COURT:  Okay.  And Mr. Bromley?

11         MR. BOTTER:  No questions, Your Honor.  Thank

12     you very much.

13         THE COURT:  And for the Committee, are there any

14     questions?

15         MR. BOTTER:  No.  Thank you, Your Honor.

16         THE COURT:  Thank you all very much for your

17     time.  Have a nice weekend.  Good-bye.

18         (Telephone conference ends at 4:57 p.m.)

19

20     I hereby certify the foregoing is a true and accurate
       transcript from my stenographic notes in the proceeding.

21

22                          /s/ Brian P. Gaffigan
                            Official Court Reporter
23                          U.S. District Court

24

25